[No. C061163. Third Dist. Sept. 20, 2011.]

DONNA HENNIGAN, Plaintiff and Appellant, v.
ALICIA WHITE, Defendant and Respondent.

COUNSEL

The Biegler Law Firm and Robert P. Biegler for Plaintiff and Appellant.

Ericksen Arbuthnot, David B. Leas, Charles S. Painter and Reginald A. Dunn for Defendant and Respondent.

OPINION

**NICHOLSON, Acting P. J.**—Plaintiff Donna Hennigan sued defendant Alicia White, White's business, Dermatique Day Spa and Permanent Cosmetics, and Premier Pigments, claiming defendants manufactured and injected defective permanent makeup into her eyelids and eyebrows, causing injuries to her face. She alleged causes of action for negligence and products liability. White moved for summary judgment, and the trial court granted her motion. The court also denied Hennigan's motion for reconsideration.

Hennigan appeals, claiming she established triable issues of material fact to defeat White's summary judgment motion, and she introduced sufficient new evidence to justify granting her motion for reconsideration. We disagree with Hennigan's claims and affirm the judgment.

## UNDISPUTED FACTS

Hennigan retained White to affix permanent makeup on her eyebrows and eyelids. According to White's opening brief, this is a tattooing procedure whereby pigment is implanted into the desired area. It obviates the need to apply regular cosmetic makeup.

Hennigan first met with White on April 19, 2003. She asked to have her eyebrows done. White used a pigment on Hennigan's eyebrows called "Brown Suede." Defendant Premier Pigments (Premier) manufactured Brown Suede. It was part of Premier's True Color Concentrate product line. White had been using Premier's products since approximately 1994.

The label on the pigment bottle contained the following notice: "Warning: This pigment is highly concentrated. Spot testing is required." In her deposition, White stated she did not perform any kind of spot test, or patch test as she called it, on Hennigan's skin prior to applying the pigment. White said it was her practice to perform the patch test only on those customers who said they were sensitive or had allergies. Hennigan did not disclose any such sensitivity to White.

When she did perform patch tests, White did so by scratching the area right behind the ear and putting a little bit of pigment in that area. She chose this area because it was close to the lymphatic system, so if the person was allergic to the pigment, "we get a fairly quick reaction."

Hennigan, however, stated in her deposition that a patch test would not have prevented her injury. She said the test "would have come out as me being fine, and they would have done it [(the tattooing procedure)], because it took several months for the reaction to take place. And that's why I didn't believe that Dermatique had done anything—or Alicia White had done anything, other than what she normally did."

About two months after receiving the pigment in her eyebrows, Hennigan returned to White's salon on June 14, 2003, for additional work. White touched up Hennigan's right eyebrow. White also affixed permanent makeup to Hennigan's eyelids. For this application to Hennigan's eyelids, White used another Premier True Color Concentrate pigment called "Black Magic."

One month later, in mid-July 2003, Hennigan began experiencing adverse reactions in the area of her eyebrows. By August, she had developed granulomas and a bacterial infection in her eyebrows and eyelids.[1] Prednisone prescribed by her doctor helped alleviate some of the adverse effects on the eyebrows and eyelids, but it caused other adverse side effects. Ultimately, one of Hennigan's eyelids drooped to such an extent that she had to undergo surgery to repair it.

In July 2004, the federal Food and Drug Administration (FDA) issued a report called an "FDA Talk Paper" that alerted the public to reports of adverse reactions suffered by those injected with certain Premier pigments, including the Brown Suede and Black Magic pigments of Premier's True Color Concentrate line. The FDA did not order a recall of any product, but noted Premier had voluntarily recalled some of its other pigments. The FDA announced its investigation into the matters, alerted consumers about possible adverse reactions, and asked consumers to report any adverse reactions to tattoos and permanent makeup to the FDA and to state and local authorities.

## PROCEDURAL HISTORY

Hennigan filed a civil complaint for damages in April 2004. She alleged causes of action for negligence and products liability. As for the negligence claim, Hennigan alleged White and the other defendants breached a duty of care "by injecting tainted, spoiled, contaminated pigments under Plaintiff's eyelids and eyebrows." She also alleged White utilized an "incompetent technique" to inject the pigments.

Regarding the products liability claim, Hennigan alleged defendants manufactured, designed and sold "tainted pigments" which were injected beneath Hennigan's skin.

---

[1] Granulomas are defined as "nodular inflammatory lesions, usually small or granular, firm [and] persistent . . . ." (PDR Medical Dict. (2d ed. 2000) p. 768.)

White filed a motion for summary judgment, or in the alternative, summary adjudication. She claimed Hennigan had failed to introduce any evidence establishing the elements of her negligence and products liability claims. Hennigan herself stated White had done nothing wrong. Also, Hennigan submitted no expert evidence establishing the pigments were defective. The fact that Hennigan suffered an allergic reaction to the pigments did not show the pigments were defective.[2]

Regarding her failure to use a patch test on Hennigan before applying the pigment, White submitted an expert declaration as evidence that the omission of a patch test did not contribute to Hennigan's injury. The expert, Dr. Whitney D. Tope, professor of clinical dermatology at the University of California, San Francisco, stated allergic reactions to tattooing "commonly do not occur for years, even decades after the application of permanent pigments. Thus, patch tests prior to full application of tattoo/permanent cosmetic pigment serve no purpose in predicting if or when allergic reactions may occur to the full application of permanent pigment."

Regarding the products liability claim, White relied upon another statement by Dr. Tope to argue Hennigan had failed to show the pigments were defective. Countering Hennigan's claim that the fact of her allergic reaction proved the pigments were defective, Dr. Tope stated: "An individual's allergic reaction to a permanent cosmetic pigment does not, in and of itself, suggest or establish that such pigment is defective; rather, it simply demonstrates the responsiveness of that particular individual's immune system to the pigment in question."

White also argued that even if the pigments had been defective, she was not subject to strict liability because she was not part of the overall producing and marketing enterprise that manufactured, designed, and sold the pigments. Rather, she was a provider of services, and she could not be held liable for using a defective product in providing her services.

In opposition, Hennigan argued she had submitted sufficient evidence on both of her causes of action to go to trial. Regarding her negligence claim, Hennigan claimed the evidence showed White had breached a duty of care by not following the manufacturer's instruction to perform a patch test on Hennigan's skin before applying the pigment. She also asserted that affidavits by her treating physicians established the element of causation. In identical statements, three of Hennigan's doctors stated "[i]t is a reasonable medical probability that Donna Hennigan's allergic reaction and related conditions were caused by the cosmetic tattooing that she had performed in April of 2003."

---

[2] White also filed a cross-complaint against Premier. Premier filed a notice of its filing under chapter 11 of the federal bankruptcy law and an automatic stay of the actions against it.

Regarding her products liability claim, Hennigan asserted her doctors' affidavits stating the pigment caused the allergic reaction and medical reports of her injuries were sufficient evidence to establish the pigments were defective under a strict liability standard of products liability and that they caused her injuries. She also argued White was both a seller of goods as well as a provider of services, and thus was engaged in the business of selling the defective product, an element required to establish strict liability.

Hennigan admitted she does not feel that White did anything wrong so as to have caused her injuries, or failed to do something such that it resulted in her injuries.

The trial court granted White's motion for summary judgment. It determined the undisputed evidence established White had not been negligent in providing her service, and there was no evidence showing the pigments White used were defective. The court disagreed with Hennigan's claim that White was negligent for failing to perform a patch test. White's evidence confirmed Hennigan's testimony that no patch test could have prevented the injury since allergic reactions can be delayed. In fact, in Hennigan's case, the reaction was delayed by a period of three months. Hennigan's belief now that a patch test would have resulted in a timely allergic reaction that would have avoided her injuries was speculative and not supported by any admissible expert evidence.

The court also found no evidence indicating the Premier pigments White used were defective. Hennigan's evidence established only that she had an allergic reaction to the pigments, not that the pigments were defective. On this point, the court wrote: "The fact that the allergic reaction may have caused plaintiff's complications does not mean that the product was defective. Plaintiff's evidence is insufficient to create a triable issue of fact since the declaration of Defendant's expert was not controverted by any admissible evidence. [Plaintiff] does not present any admissible evidence showing that the product was defective."

Hennigan filed a motion for reconsideration pursuant to Code of Civil Procedure section 1008. She attached new declarations from herself and her treating physicians which she claimed contained new or different facts. In separate declarations, two of her three physicians stated Hennigan's allergy "could have been timely detected, to a reasonable medical certainty, if the patch test on the skin had been timely administered by the Defendant. Said test is administered at said site to assure as timely a response as possible to a said allergy testing. This is the reason that patch tests are the standard of care for allergy testing." A third physician crossed out the just quoted lines in his affidavit when he signed it.

In her own additional declaration, in an attempt to qualify her transaction with White for strict products liability as one for the purchase of a product instead of a service, Hennigan claimed her primary purpose for going to White was to obtain the Premier pigments, not just to have White perform a service.

The trial court denied the motion for reconsideration. It determined the declarations submitted with the motion did not contain any new facts. It also stated Hennigan failed to show why she could not have presented this evidence at the hearing on the motion for summary judgment.

Hennigan now appeals. She claims she submitted sufficient evidence on her negligence and strict products liability claims to have her complaint go to trial. She also claims the court erred in denying her motion for reconsideration. She asserts the declarations submitted with her motion held new evidence in the sense they addressed arguments that had not been raised in the summary judgment motion's moving papers but were raised at oral argument on the motion. We address and reject each contention.

## DISCUSSION

### I

### *Summary Judgment*

A. *Standard of review*

A trial court will grant summary judgment where there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. A defendant moving for summary judgment must prove the action has no merit. This is done by showing one or more elements of plaintiff's cause of action cannot be established or that there is a complete defense to the cause of action. Plaintiff then bears the burden of showing a triable issue of material fact exists as to that cause of action or defense. (Code Civ. Proc., § 437c, subds. (c), (o)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843, 849–850 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

On appeal, we exercise our independent judgment. (*Starzynski v. Capital Public Radio, Inc.* (2001) 88 Cal.App.4th 33, 37 [105 Cal.Rptr.2d 525].) In determining whether there is a triable issue of material fact, we consider all the evidence set forth by the parties except that to which objections have been made and properly sustained. (Code Civ. Proc., § 437c, subd. (c); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) We resolve evidentiary conflicts, doubts, or ambiguities in the

opposing party's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143].)

B. *Negligence cause of action*

Hennigan claims White's failure to perform a patch test on her before applying the pigment was sufficient evidence of negligence to survive the summary judgment motion. She claims the case of *Romero v. And'ra* (1963) 216 Cal.App.2d 295 [30 Cal.Rptr. 645] (*And'ra*) established that White had a duty to comply with the manufacturer's instructions to perform the patch test, and her failure to do so resulted in Hennigan's injuries.

In *And'ra*, the First Appellate District of the Court of Appeal reversed a judgment in favor of a hair stylist who had bleached the plaintiff's hair. The trial court had refused the plaintiff's requested jury instruction on res ipsa loquitur. The Court of Appeal concluded refusing the instruction was prejudicial error. There was sufficient evidence in the case supporting the application of res ipsa loquitur, including the stylist's failure to perform a patch test as directed on the bleach packaging, to justify an instruction on the doctrine. (*And'ra, supra*, 216 Cal.App.2d at pp. 300–303.)

 Ruling res ipsa loquitur could potentially be available when dyes are used, Justice Kaufman wrote for the court: "The patron coming to the beauty salon relies upon the skill and knowledge of the operator who is issuing the treatments to her [citation]. When a patron of a beauty salon requests a well-known treatment and submits to that process, a part of which involves a chemical, she has a right to expect that precautionary instructions of the manufacturer relating to the application of the solution to her hair will be complied with [citation]." (*And'ra, supra*, 216 Cal.App.2d at p. 300.)

Before us, Hennigan claims *And'ra* established a duty of care to comply with a manufacturer's instructions to perform a patch test before applying permanent pigment to someone. White breached this duty, and, Hennigan claims, that breach resulted in her injuries.

Assuming for purposes of argument only that White breached a duty of care established by *And'ra* by not performing a patch test, we nonetheless affirm the trial court's judgment against the negligence claim because Hennigan submitted no evidence showing the breach of duty proximately caused her injuries. At the time the trial court heard the motion for summary judgment, Hennigan had submitted no evidence establishing that White's omission of the patch test caused her injuries. Her doctors stated the tattooing likely caused her allergic reaction, but none of Hennigan's evidence indicated the reaction would have likely been prevented had White performed the patch test.

The only evidence on this point was the opinion of White's expert witness, Dr. Tope. Dr. Tope stated allergic reactions to pigments may not occur for years after application. Thus, a patch test may not be able to predict before full application of the pigment whether an allergic reaction would occur. Indeed, Hennigan herself stated White did nothing wrong by omitting the patch test because she did not experience her reaction until approximately three months after the first application.

■ Because the only evidence before the trial court indicated a patch test likely would not have disclosed Hennigan's allergy to the pigment, the court could not find a contested issue of fact over whether omitting the patch test proximately caused Hennigan's injury. The court thus correctly granted summary adjudication against Hennigan's negligence cause of action.

## C. *Strict products liability cause of action*

Hennigan claims her doctors' statements that her allergic reaction was caused by the tattooing were sufficient evidence to establish a triable issue of fact over whether the pigment was defective. She claims the trial court erred by requiring direct evidence of the pigment's defect instead of allowing her to prove for purposes of summary judgment that the pigment was defective by inference. We conclude the trial court correctly granted summary adjudication against Hennigan's strict products liability cause of action.

■ As a condition precedent to maintaining a strict products liability claim, a plaintiff must show the transaction in which she obtained the product was one in which the transaction's primary objective was to acquire ownership or use of a product, and not one where the primary objective was to obtain a service. " '[C]ourts have not extended the doctrine of strict liability to transactions whose primary objective is obtaining services. . . .' [Citation.]" (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 258 [38 Cal.Rptr.2d 65].)

In this case, Hennigan's primary objective in patronizing the Dermatique salon was to obtain a service, that of having permanent makeup affixed to her eyebrows and eyelids. She did not walk into the salon simply to purchase a bottle of pigment for her own use. Rather, she sought White's service to affix the pigment she selected to her face. In this circumstance, White cannot be held strictly liable for providing a service that involved the use of possibly defective products.

Even if we were to conclude White was primarily selling a product, we still would affirm the trial court's grant of summary judgment. To recover on her strict products liability claim, Hennigan must establish the pigments were

defective. (*Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 703 [106 Cal.Rptr. 1, 505 P.2d 193].) Hennigan submitted no evidence showing the pigments were defective. The fact that Hennigan suffered an allergic reaction is insufficient by itself to establish the pigments were defective for purposes of strict products liability.

■ The parties have cited to no published California authority on this point, and we have found none. However, we agree with the opinion of the United States Court of Appeals for the Seventh Circuit when it decided as a matter of the state law of Wisconsin that evidence of an allergic reaction by itself does not establish a product is defective for purposes of strict products liability. In a case concerning a claim for strict products liability when a consumer suffered an allergic reaction to glue she used to apply artificial fingernails, the court wrote: "[A] consumer who suffers an allergic reaction to a product without any identifiable defect, such as the reaction of the plaintiff to the glue, may not invoke the doctrine of strict liability to recover from a manufacturer or a seller. Annotation, *Products Liability: Strict Liability in Tort Where Injury Results from Allergenic (Side-Effect) Reaction to Product,* 53 A.L.R. 3d 298, § 3 (1973) ('[A] product, faultlessly manufactured and containing no impurities, is not rendered defective per se, within meaning of the doctrine of strict liability in tort, by the mere fact that it causes injury to certain individuals who, because of hypersensitivity or other peculiarity of makeup, suffer an allergenic or idiosyncratic reaction when exposed thereto.')" (*Adelman-Tremblay v. Jewel Companies, Inc.* (7th Cir. 1988) 859 F.2d 517, 522.)

Other than the fact of her allergic reaction, Hennigan submitted no evidence in support of her strict product liabilities claim. Because she propounded no discovery on Premier, there is no evidence in the record establishing facts demonstrating the pigments were defective for purposes of strict liability. No evidence addresses how Premier designed or manufactured the pigments. No evidence shows defendants had a duty to warn at the time Hennigan received her applications because they knew or had reason to know the pigments could cause an allergic reaction such as Hennigan suffered. The FDA Talk Paper was issued one year after Hennigan began experiencing adverse effects. Under such circumstances, the mere fact of an allergic reaction is insufficient to establish a dispute over whether the product at issue was defective.

Because Hennigan failed to introduce facts showing White primarily sold her a product instead of a service, or showing the pigments White sold her were defective, the trial court correctly granted summary adjudication against Hennigan's claim of strict products liability.

## II

### *Motion for Reconsideration*

In her motion for reconsideration, Hennigan attempted to introduce additional evidence on the very points we have just relied upon to uphold the grant of summary judgment. For her negligence claim, Hennigan sought to introduce declarations by her doctors stating a patch test would have prevented her injuries, contrary to Dr. Tope's testimony.

For her strict products liability claim, Hennigan sought to introduce a declaration by herself to claim her primary purpose for hiring White was to obtain pigments made by Premier, not simply to have White render services. She stated that 18 months before visiting White, she had had Premier permanent makeup applied to her face and had no problems with that pigment. She did not believe there would be any problems with another application of Premier pigment, and she would not have hired White if White had not used Premier pigments.

Hennigan admits the facts contained in these additional declarations were known to the declaring parties at the time of the summary judgment motion, but she claims they nonetheless are new for purposes of a motion for reconsideration because they were not relevant to the arguments White made in her moving papers. She specifically asserts White's negligence argument concerned the issue of duty, not the issue of causation and the patch test. Her assertion is incorrect.

In her opening memorandum of points and authorities in support of the motion for summary judgment, White addressed the issue of the patch test. She expressly argued against finding any liability based on her failure to administer the test. She also submitted Dr. Tope's declaration to address whether omitting the patch test could have prevented Hennigan's injuries. Moreover, Hennigan responded to these arguments in her opposition to the motion, arguing White was negligent for not performing the patch test. Hennigan thus cannot claim the issue of causation in the form of White's omission of the patch test was a new issue at the hearing or that the declarations constituted new information that could not have been known before the motion was heard.

Hennigan's own declaration suffers a similar fate. At the time of the motion, Hennigan obviously was aware of the information contained in the new declaration about her reasons for patronizing White's business. However, she did not introduce these assertions at that time even though White

expressly argued in her moving papers that she could not be strictly liable for products liability because she had provided a service instead of a product.

Accordingly, the trial court correctly denied Hennigan's motion for reconsideration to admit her doctor's supplemental declarations and her own declaration, as the testimony did not constitute "new or different facts" for purposes of granting reconsideration. (Code Civ. Proc., § 1008, subd. (a); *Garcia v. Hejmadi* (1997) 58 Cal.App.4th 674, 688, 690 [68 Cal.Rptr.2d 228].)

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to White. (Cal. Rules of Court, rule 8.278(a).)

Hull, J., and Robie, J., concurred.